ROLAND GENTRY *against* JAMES MADDEN AND OTHERS.

ERROR *to Pulaski Circuit Court.*

In trover, though the taking might have been lawful, yet if the defendant took upon himself the right, and assumed the control of the property, whether it came to his possession by finding, or otherwise, it is sufficient evidence of conversion, without a previous demand and refusal.

It is not necessary that there should be a manual taking, or that the defendant should have applied the thing to his own use. If he exercised a control over it, in exclusion of, or in defiance of, the plaintiff's right, it is in law a conversion, be it for his own, or another's use.

If a person therefore finds a raft of timber on a sand bar in a navigable river, high and dry, and takes possession of it, and assumes to dispose of it, hires a person to assist him in removing a part of it, and sells that person his interest in the remainder, reserving to himself the portion removed, it is a conversion of the whole.

And the fact that a raft is aground on a sand bar, where it would safely remain until a rise, if not taken away, does not show the property to be lost or abandoned, if the owner knew where it was; and a stranger is no more justified in taking possession of it, than of any other property not in the owner's immediate possession or inclosure.

Where an actual tortious taking, or an actual conversion, is proved, there is no need of a demand.

This was an action of trover commenced by James, Thomas and Phillip Madden, against Tarlton Massengill and the plaintiff in error, for converting four lots or blocks of pine plank, containing sixteen thousand feet, of the value of four hundred dollars. The writ was served on both defendants. At November term, 1838, Gentry filed his plea of not guilty, and the case was continued. At September term, 1839, the plaintiffs joined issue to Gentry's plea, and a trial was had by jury, and a verdict for Gentry. A new trial was granted, and at March term, 1840, the case was again tried, and a verdict found against Gentry for $250.

On the trial the evidence adduced was as follows: Slinkard stated that on the first of March, 1838, he was employed by Mr. Madden to come down with a raft. About twelve miles above Little Rock they got aground on a bar, and had to leave four blocks, and come on down with the balance. There were from 15 to 16,000 feet in the four blocks, and lumber was selling at the Rock at from $20 to

$25 a thousand.  Got aground on the bar a little above Maj. Fields' place.  Returned to the bar the next day, but the river was falling. Did not return again until May following, which was the first rise after he left there, and the blocks were gone.   The lumber was worth $20 to $25 a thousand, out of water.  It was pine flooring lumber, sawed on Piney Creek.  It was the Maddens' plank.  It would have remained on the bar till he returned in May, if it had not been taken away.

Dent stated that the plank was discovered by Massengill lying on the bar.  Massengill and Gentry went over to it in a canoe.  Massengill first saw the plank and got Gentry to go over with him, and agreed to go halves.  They took it to be drift.  Witness agreed, if all parties were willing, that he would go over and help them, if they would give him plank enough to lay a floor in his house, sixteen feet square, and they both said they were willing.   There were four blocks, when they got there, a little wrecked; two blocks seemed to be turned under, and the under two were buried in the sand.   After we got out about 130 plank, Gentry asked me if I did not want his part of the plank; and Massengill insisted on my taking it, and said Gentry was willing to give up the raft and take for his part what was taken ashore.   Gentry took the 130 plank for his part of the raft which he sold to me; and I helped Massengill to re-raft the plank and take it to Little Rock, to deal with it according to law.   We came down and consulted Lawyer Blackburn, at Little Rock, to know what we should do, who told Massengill that he knew whose plank it was, that it belonged to Mc-Clanahan, a friend of his, and was lost; that he would befriend Mc-Clanahan, and hold on to the raft, and agreed to take charge of it, have it brought out, and pay us whatever the law entitled us to for salvage.   Blackburn fastened the raft at the landing, and we gave it up to him.   When we re-rafted the plank, we had to carry it some fifty or sixty yards in the river.   The four blocks were very safely lodged, and would not have gotten away for some time after they were lodged.   Another raft lodged about two miles below, the same fresh. Massengill said that Gentry thought he would get the 130 plank for nothing, but that he was mistaken, because it would have to be ac-

counted for when we got to Little Rock. If a rise had come, the top blocks were bound to have floated off.

This being all the evidence in the case, the court refused to give the following instructions asked for by Gentry:

That in a case of finding, when there is no evidence of a tortious taking, there must be evidence of a demand, and refusal on the part of the defendant to deliver up the property, in order to entitle the plaintiff to recover; and

That the defendant in this case is liable only for the value of the plank which he converted to his own use.

These instructions being refused, Gentry excepted.

PIKE, for plaintiff in error:

Admitting that Gentry kept possession of the 130 plank, three questions are presented by the record:

*First:* Was it a conversion by Gentry after a *finding*, or was it a tortious taking?

*Second:* If it was originally a *finding*, was or was not a demand to deliver and a refusal, necessary to make a conversion?

*Third:* Admitting there was a conversion, how far was Gentry liable?

First, then, was it a *finding*, or a *tortious taking?* Upon this point, it seems to us, there can be no doubt. The plank is discovered wrecked upon a sand bar. Two of the blocks are turned over, and the lower two wrecked upon the sand. If a rise comes, the upper part must float off. No person is with it, and it lies there, in the Arkansas river, in every sense of the word, a wreck. By the Territorial law then in force, when any such raft was " lost, wrecked or adrift, and in a perishable condition," on any river or navigable water course, it was lawful for any person to take it up and secure it; and for doing so, he was entitled to a salvage of 10 per cent.

It is clear that it was the intention of the finder to obtain salvage, and to that end, to deal with the plank according to law. Gentry, however, desirous to avoid trouble, agreed to give up to Dent all his claim on the raft for the 130 plank which had been taken ashore; which was agreed to. Whether Gentry retained the plank is not positively

stated; but at all events he wished no more. And although it was argued below that he sold to Dent one-half *the raft* for 130 plank, the idea is preposterous. Why sell half of four blocks of plank for a few plank, part of the same half? It is plain that he sold his claim to salvage—and Dent and Massengill immediately proceeded to carry the plank to Little Rock, there to deal with it according to law. What became of it after it was fastened to the landing we do not know.

Second: This being originally a finding, how did a conversion arise? We contend that in such case there could be no conversion, unless by demand and refusal.

The *conversion* is the gist of the action. The manner in which the goods came into the hands of the defendant, is mere inducement, and need not be proved. 3 *Star. Ev.* 1492. A conversion, it is said, seems to consist in any *tortious* act, by which the defendant deprives the plaintiff of his goods, either wholly or for a time. *Ib.* The allegation of conversion does not necessarily import an acquisition of property by the defendant, for a conversion may be an actual destruction of the property. The deprivation of property to the plaintiff is the foundation of the action. *Keyworth vs. Hill,* 3 *B. and A.* 683.

But in general, evidence of some tortious act is essential to a conversion, and it is not sufficient to prove mere non-feasance. 3 *Stark. Ev.* 1495; *Bromley vs. Coxwell,* 2 *Bos. and Pul.* 438.

The ordinary presumptive proof of a conversion consists in evidence of a demand of the goods by the plaintiff, and a refusal to deliver them by the defendant who has possession of them. 3 *Stark. Ev.* 1496; *Baldwin vs. Cole,* 6 *Mod.* 212; *Bristol vs. Burt,* 7 *J. R.* 254; *McCombie vs. Davis,* 6 *East* 540. This proof is always necessary, where the goods came *lawfully* into the defendant's possession, *as by finding,* or a bailment, or delivery of the owner. 3 *Stark. Ev.* 1497. And where evidence of a demand and refusal is given, it does not always show a conversion; as where A. having found goods, refuses to deliver them, because he does not know whether the person demanding is the true owner. 3 *Stark. Ev.* 1499.

The Territorial statute on the subject of salvage, *p.* 507, *sec.* 5, agrees with the English law in this particular. It is thereby provided,

Gentry *against* Massengill and others.

that in case the taker up refuses to make oath that he was not instrumental in causing the property to be exposed to loss, and that he has not secreted, retained or disposed of, or caused to be secreted, retained or disposed of, any part of the property; *and on his refusal to deliver such property*, the owner may recover the value thereof by an action of trover and conversion.   This is analogous to the case of taking up an estray; and in *Nelson vs. Merriam*, 4 *Pick.* 249, it was held that where a person had taken up an estray, and had kept it, without pursuing the steps pointed out by law, he was not liable to an action of trover, unless he used the estray or refused to deliver it on demand.   The court there said that the failure to complete the proceedings required by the statute, might or might not render the original taking tortious, according to the original character of the taking.   That where an estray was taken up for the purpose of preserving it for the owner, the original taking was not only lawful, but praiseworthy, and then the defendant was in possession by a rightful, and not a tortious act, and trover could not be maintained without evidence of some actual use of the estray by the defendant, or of a refusal to deliver upon demand. See *Drake vs. Shorter*, 4 *Esp.* 165.

In the present case, it is perfectly clear from the evidence, that Massengill and Gentry took possession of the plank for the sole purpose of preserving it for the owner, and obtaining salvage.   Every act speaks this—and though they had no right to retain possession of any portion of the plank, yet unless the portion so retained was *used*, there was no conversion.

By the statute itself, the action of trover is only given where the taker up refuses to take the oath required by law, and also refuses to deliver up the property on demand.   This is conformable to the common law, where there is a *finding*, as well as consonant with justice. There is no proof whatever that Gentry used any portion of the plank, or even took possession of it—and for aught that appears in evidence it may be still lying on the bank, or have been taken away by the owners, whoever they were, for there was no proof that the plank was owned by the plaintiffs in this suit.

We think, therefore, that there was in fact no proof of conversion in

this case; and that the court below erred in refusing to give the first instruction above mentioned.

Third: If there was conversion, how far was Gentry liable?

It must be at once admitted that the original taking of the plank constituted no conversion. Up, to the time when Massengill and Dent started with the plank to Little Rock, there could have been no conversion, except as to the 130 plank, if as to that. The residue had not at that time been converted by any body, for Massengill and Dent were then taking it to Little Rock, to be dealt with according to law.

The only conversion, therefore, which Gentry could by possibility have been guilty of, was of the 130 plank.

Now in trover no damages are recoverable for the act of taking. *Cooper vs. Chitty*, 1 *Bur.* 31; *Wickliffe vs. Sanders*, 6 *Mon.* 296.

The amount of damages in an action of trover cannot be more than the value of the thing converted, and legal interest. *Sanders vs. Vance*, 7 *Mon.* 213, 214; *Dillenback vs. Jerome*, 7 *Cowen* 294.

The defendant below could therefore be liable for no more plank than he *converted*. The 130 plank which he agreed to receive as his share, was the utmost extent of his conversion; and the value of that amount of plank was not proven. We think, therefore, that the court erred in refusing the last instruction; and that the judgment should be reversed.

TRAPNALL, COCKE, *Contra:*

The conversation and remarks of the co-defendant Massengill cannot be evidence in the case, though incorporated in the record. It is evident from the testimony: first, that the plank was not lost or adrift. 2nd. That the taking by the defendant in the court below was not by finding, but was made with a view to a division and appropriation of the plank, and therefore was wrongful, and accompanied by circumstances of actual conversion, and therefore exempted the plaintiffs below from proving a making a demand and refusal. "A conversion may arise either by a wrongful taking of the chattel, or by some illegal assumption of ownership, or by illegal using or misusing it,

or by wrongful detention." 1 *Chit. Pl.* 140, 141; 3 *Wils.* 33; *Willes* 55; 2 *Saund.* 47; *Bullers N. P.* 44.

The taking being wrongful, the wrong doers are individually and jointly responsible for the whole amount of the damage done to the persons injured: any participation in the illegal violation of the rights of others makes the participator responsible for the whole injury suffered. *Prince vs. Flyner*, 2 *Litt.* 24; *Nations vs. Gray*, 1 *Ark.* 557.

And therefore if Gentry was responsible at all, he was responsible for the full amount.

The taking was evidently tortious; the object of the taking, the amount of the injury sustained, the weight of the evidence, are facts which belong exclusively to the consideration and decision of the jury, where we respectfully hope the court will leave them.

DICKINSON, *Judge*, delivered the opinion of the court:

One of the points in this case is whether there was sufficient evidence of a conversion to justify the verdict. The principle is well settled, that although the taking might have been lawful, yet if the defendant took upon himself the right and assumed the control of the property, whether it came to his possession by finding or otherwise, it is sufficient evidence of conversion, without a previous demand and refusal. *Buller's N. P.* 44. The declarations and acts of the defendant below united, form an assumption of control over the plaintiff's property. The taking possession and assuming to dispose of the four blocks, as he evidently did do in hiring Dent to assist him in removing a part of the plank, and afterwards selling to him his interest in the remainder, reserving to himself the portion carried out, is certainly a conversion.

In the case of *Kent vs. Welsh*, 7 *J. R.* 257, the court decided that it was neither necessary that there should be a manual taking of the thing in question by the defendants, or that he should have applied it to his own use. But that if he exercised a control over it in exclusion of, or in defiance of, the plaintiff's right, it is in law a conversion, be it for his own or another's use. The same principle is maintained and carried out in the case of *Murray ét al. vs. Burling*, 10 *J. R.* 172; and in 2 *Starkie*, 147.

The plaintiff in error however contends that, in any event, he is only liable for the 130 plank which he agreed to take for his part of the raft. We see no difficulty in this objection, for if there was a conversion of the 130 plank, it was but a continuance of that control which he had assumed, in the first instance, to exercise over the whole property. He hired Dent to assist him in doing what? In taking out and placing it in such a position as to dispose of it with more facility. These facts were all before the jury, and having been passed upon by them, the verdict ought not to be disturbed on that ground.

The other witness proves that the property was not lost, that the four blocks were left aground; that he visited them the next day, but that the river had fallen too much to permit him to remove them. That in May following, on the first rise of the river, he returned, when he discovered that the four blocks were gone, and that they would have remained at the place he left them if they had not been taken away. This evidence is conclusive that the property was not either lost or abandoned; and therefore the taking possession was no more a justification than the taking of any other property which was not at the time in the owner's immediate possession or inclosure. The defendant knew that it was not his own property, and the jury correctly considered him as a wrong doer and trespasser from the beginning. If such be the facts, and these the conclusions to which the jury were brought by the evidence, he could not entrench himself behind the statutory provisions relating to property lost, wrecked, or adrift, and in a perishable condition upon the river, for no one of his acts evinced the slightest intention on his part to make the law his guide in the disposition of the property. On the contrary the whole of the evidence justifies the opinion that he intended to convert it to his own use, and that such intention was actually carried into execution.

There is no clearer principle laid down than that if an actual tortious taking be proved, it is not necessary to prove an actual demand, for the taking being unlawful is itself a conversion; so likewise if an actual conversion be proved, it is not necessary to prove a demand. The evidence shows how the property came to the hands of the defendant, and that there was not only a tortious taking, but an actual conversion by the defendant.

We discover no error in the refusal of the Circuit Court to give the instructions asked for. The judgment must therefore be affirmed with costs.